## In the
## United States Court of Appeals
### For the Seventh Circuit

No. 09-2288

ADNAN I. ISSAQ,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review from an Order
of the Board of Immigration Appeals.
No. A 075 056 464

ARGUED DECEMBER 4, 2009—DECIDED AUGUST 17, 2010

Before POSNER, RIPPLE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* In 1997, Adnan Issaq, a citizen of Iraq, moved with his parents and three siblings from Syria to the United States, where they were admitted as refugees. Issaq and his family are Christians of Assyrian descent. His father, a native of Iraq, and his mother, a Syrian, were married in Syria but settled in Baghdad, Iraq, where Issaq was born in 1978. Fearing

religious persecution, Issaq's parents took the family to Syria in 1991. There they remained through late 1997, until their application for refugee status was approved and they came to the United States. Once here, the family settled in DuPage County, Illinois, just west of Chicago. Issaq became a permanent resident of the United States in 2001.

Unfortunately, Issaq developed a drug habit, which led to other crimes and ultimately to the removal proceedings now before us. Issaq was charged with committing a number of residential burglaries near his home in late 2005. He pleaded guilty to one count, and in March 2007 an Illinois court sentenced him to 180 days in prison and two years of probation, including inpatient substance-abuse treatment. In May 2007, after Issaq had served his prison term, the DuPage County Jail released him to a rehabilitation program called the Treatment Alternatives for Safe Communities. Issaq soon blew the chance he had been given. Two months into the program, Treatment Alternatives expelled him for using drugs and for arranging with others to bring drugs into the treatment facility. Issaq's expulsion violated the terms of his probation, and a warrant issued for his arrest. He remained on the loose until December 2007, when a local police officer pulled his car over after a traffic violation. Issaq gave the officer his brother's driver's license and attempted to flee when he was asked to follow the officer to the police station. This led to new charges, to which Issaq pleaded guilty. The court sentenced him to five years' imprisonment as the penalty for violating his probation for the residential

burglary, and it imposed an additional year, to run concurrently, for obstruction of justice in connection with the new conviction for the traffic violation.

**I**

When Issaq's problems with the law came to the attention of the Department of Homeland Security ("DHS"), it initiated proceedings in which it charged that Issaq was removable as an alien convicted of an aggravated felony. 8 U.S.C. § 1227(a)(2)(A)(iii). At an October 2008 hearing before an Immigration Judge ("IJ"), Issaq conceded that residential burglary, a Class 1 felony in Illinois, 720 ILCS 5/19-3(b), is an "aggravated felony" within the meaning of the Immigration and Nationality Act ("INA"), see 8 U.S.C. §§ 1101(a)(43)(G) and 1227(a)(2)(A)(iii). A month later, Issaq applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). In his application, Issaq asserted that because of his identity as an Assyrian Christian, he faced life-threatening persecution and torture at the hands of Muslim extremists if he were returned to Iraq.

The IJ held a hearing on Issaq's case on December 17, 2008. The judge began by confirming that Issaq was ineligible for asylum because his residential burglary offense was an aggravated felony. Next, the judge found that Issaq's crime was "particularly serious" (another term of art under the INA), and thus he was barred from withholding of removal by 8 U.S.C. § 1231(b)(3)(B)(ii). This left just one question: whether

Issaq was entitled to relief in the form of withholding of removal under the CAT.

Issaq testified that he believed that he would be tortured in Iraq on account of his religion. His belief was based solely on his membership in the group of Assyrian Christians; he offered no reason why he in particular would be singled out. Cross-examination revealed that he was unaware of the fact that there are approximately a million Christians currently living in Iraq. Issaq's father, Isho Shamoon, testified that the entire extended family has now left Iraq. Shamoon shared the opinion that his son would be killed if he were returned. Radicals, he stated, had been asking about the family, and a former neighbor warned him that "they" were looking for Shamoon. This was enough to endanger the son as well, Shamoon thought. Issaq's mother, Leila Youkhana, also testified. She mentioned pressure on Christian women in Iraq to adopt Muslim dress, and she too predicted that Issaq would be killed if he were sent back.

The IJ found all of this testimony credible but insufficient to warrant relief under the CAT. Iraq, the judge observed, has undergone "vast changes" since 1991, when Issaq's family left the country. Given the number of Christians, and even Christians of Assyrian ethnicity, the court found no basis for the family's dire predictions of death or torture. Indeed, the court found no evidence apart from these opinions about the likelihood of torture. He acknowledged the fact that there is social friction and violence in Iraq today, but that alone was not

enough to show that Issaq would be tortured by a public official, or that the government would condone his torture by others. Notably, however, the IJ had nothing to say about an International Religious Freedom Report that Issaq had tendered in support of his petition on the day of the hearing. See http://www.state.gov/g/drl/rls/irf/2008/108483.htm (last visited August 13, 2010). That Report catalogued several incidents in Iraq of abuse against Assyrian Christians. It also noted, under the heading "Abuses by Rebel or Foreign Forces or Terrorist Organizations" that

> [m]any individuals from various religious groups were targeted because of their religious identity or secular leanings. Acts committed against them included not only harassment and intimidation but also kidnapping and murder. The general lawlessness that permitted criminal gangs, terrorists, and insurgents to victimize citizens with impunity affected persons of all ethnicities and religious groups. The magnitude of sectarian attacks, while difficult to track, appeared to decline during the reporting period. While such incidents were progressively fewer, Shi'a in Sunni-dominated neighborhoods, Sunnis in Shi'a-dominated neighborhoods, and religious minorities in both Sunni- and Shi'a-dominated neighborhoods reported receiving death threat letters demanding that they leave their homes, and in many cases individuals either complied or were killed.

The IJ concluded by denying Issaq's request for relief under the CAT and ordering him removed to Iraq.

The Board of Immigration Appeals ("Board") found that the IJ had "adequately and correctly addressed the issues presented." In response to Issaq's objection to the finding that he was ineligible for withholding of removal, the Board noted that once a crime is determined to be particularly serious, there is no need for an additional finding that the person is a danger to the community. Even if he were not ineligible for withholding, the Board continued, he could not prevail on the merits because the record did not establish that his life or freedom would be threatened in Iraq on the ground of his race, religion, nationality, membership in a particular social group, or political opinion. See 8 U.S.C. § 1231(b)(3)(A). Nor did Issaq prove that it was more likely than not that he would be tortured for any cognizable reason if removed to Iraq. See 8 C.F.R. § 1208.16(c). Finally, the Board rejected without explanation Issaq's complaint that the IJ erred by failing to consider the International Religious Freedom Report in his analysis. Overall, it thought, he had received a fair hearing and an acceptable explanation. Acting through a single member, the Board thus dismissed his appeal.

## II

In his petition for review in this court, Issaq raises two arguments: first, that the Board erred when it characterized his crime as "particularly serious" and for that reason decided that he was ineligible for withholding of removal, and second, that it committed legal error when it determined that he could not qualify for relief under

the CAT. Citing 8 U.S.C. § 1252(a)(2)(C), the government responds that this court lacks jurisdiction to adjudicate the petition. It acknowledges that we would be authorized to review the Board's decision if Issaq's petition raised a constitutional or other question of law, see 8 U.S.C. § 1252(a)(2)(D), but it asserts that his petition fails to do so.

## A

We consider first Issaq's effort to qualify for withholding of removal. His initial problem arises because of the provision of the INA depriving the courts of jurisdiction to review any part of a removal order based on a finding that the alien is an aggravated felon:

> Notwithstanding any other provision of law (statutory or nonstatutory) . . . and except as provided in subparagraph (D), no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section . . . 1227(a)(2)(A)(iii) [which includes aggravated felonies] . . . of this title . . . .

§ 1252(a)(2)(C). Notwithstanding the superficially absolute nature of this language (apart from the exception for subparagraph (D)), we have decided that it still permits us to decide whether the person before the court is the one who committed the crime, and whether the crime was properly characterized as an aggravated felony. *E.g., Guerrero-Perez v. INS,* 242 F.3d 727, 730 (7th Cir. 2001).

More importantly for Issaq's petition, subparagraph (D) carves out an exception to the jurisdictional bar for "constitutional claims or questions of law." 8 U.S.C. § 1252(a)(2)(D). In applying this part of the statute, it is important to distinguish between legal claims that may be unlikely to prevail from claims that are so lacking in substance that they should not be adjudicated at all. In our view, Issaq's arguments fall in the former category, not the latter.

The first problem we must address, however, is whether Issaq's legal arguments are beside the point, because the Board offered an alternative, fact-based reason for denying relief. In its order, the Board said:

> We further find that the respondent has not established his eligibility for withholding of removal even if he was not barred from consideration. He has not established that his life or freedom would be threatened in Iraq, a country he left 18 years ago, because of his race, religion, nationality, membership in a particular social group, or political opinion.

Issaq's only argument about this part of the case is that the Board's decision rested on a flawed hearing before the IJ. He phrases this as a due process argument, although it would be better cast as an argument that he did not receive the fair hearing to which he is entitled under the statute. See *Khan v. Mukasey*, 517 F.3d 513, 518 (7th Cir. 2008). The key problem, as he sees it, was the IJ's failure to consider the International Religious Freedom Report.

Issaq has continued in his petition for review to pursue this argument. Although his brief does not make it

clear whether he wishes to make this point with respect to both withholding and the CAT, or just the CAT, the Report is pertinent to both (setting aside the issue whether his crime was "particularly serious"), and so we will give him the benefit of the doubt and consider it for both theories. In our view, his contention that the record on which the IJ and Board relied was deficient is enough to support a legal argument with respect to the Board's alternate holding. It is troublesome that the IJ made no mention of the Report. The Board seems to have relied on a presumption of procedural regularity and to have assumed that the IJ read and took account of the Report, but we have no idea whether this is so. Normally, we require the Board to discuss the key evidence that the parties have presented. See, *e.g.*, *Gebreeyesus v. Gonzales*, 482 F.3d 952, 954 (7th Cir. 2007) (citing *Kay v. Ashcroft*, 387 F.3d 664, 674 (7th Cir. 2004), and *Mansour v. INS*, 230 F.3d 902, 908 (7th Cir. 2000)). But Issaq cannot obtain a remand on this ground unless he can show prejudice from any violation that occurred. See *Bayo v. Napolitano*, 593 F.3d 495, 506 (7th Cir. 2010) (*en banc*). The excerpt of the Report that we set out above indicates that the problem of violence is pervasive throughout Iraq; nothing suggests that every Assyrian Christian faces a better than even chance of being tortured or killed, nor is there anything in it to suggest that Issaq faces a particular risk. Although the question seems close to us, we conclude that the Report is not enough on its own to support a finding that any persecution Issaq would face would occur at the hands of government agents, or would otherwise be condoned by the government.

In case we are wrong about that, and the evidence including the Report would have supported withholding, we think it prudent to turn to Issaq's other argument for this relief. The INA states that "an alien who has been convicted of an aggravated felony (or felonies) for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years shall be considered to have committed a particularly serious crime." 8 U.S.C. § 1231(b)(3)(B), final paragraph. It adds that the Attorney General is also entitled to determine that, "notwithstanding the length of sentence imposed, an alien has been convicted of a particularly serious crime." *Id.* The question Issaq is raising is how to interpret the phrase "aggregate term of imprisonment." Whether an agency correctly interprets a statute is a question of law. See *Huang v. Mukasey*, 534 F.3d 618, 620 (7th Cir. 2008). Issaq argues that the term refers only to the sentence that appears in the court's initial judgment. With that in mind, he points out that his initial sentence for the residential burglary was 180 days' imprisonment plus two years' probation; it was not until he violated the terms of his probation that the sentence was extended by another five years. Focusing exclusively on the initial sentence, he draws the conclusion that his crime was not a "particularly serious" one.

Issaq's position, however, disregards the use of the word "aggregate" in § 1231(b)(3)(B)'s final paragraph. If Congress had meant to look solely to the initial term of imprisonment, it would have used different language. Instead, it said "aggregate term," a phrase that rules out

such a narrow reading. We conclude that all periods of imprisonment associated with a particular conviction must be counted toward the five years specified in the statute. Issaq's residential burglary crime thus led to an aggregate of more than five years' imprisonment and was a "particularly serious" felony for purposes of § 1231(b)(3)(B). This makes it unnecessary for us to decide whether the Attorney General abused his discretion in characterizing the crime as "particularly serious" notwithstanding the length of the sentence.

The government complains that Issaq did not present his argument about the meaning of the statute to the Board, and thus (it says) our jurisdiction is barred on a different ground—failure to exhaust. It is true that an alien must exhaust "all administrative remedies available to the alien as of right," 8 U.S.C. § 1252(d)(1), and that this includes the obligation first to present to the Board any arguments that lie within its power to address. *Ghaffar v. Mukasey,* 551 F.3d 651, 655 (7th Cir. 2008). This is not, however, a jurisdictional rule in the strict sense that the Supreme Court has emphasized we must follow. See *Marin-Rodriguez v. Holder,* 2010 WL 2757321 (7th Cir. July 14, 2010) (No. 09-3105) (discussing *Morrison v. Nat'l Austl. Bank Ltd.,* 130 S. Ct. 2869 (2010); *Reed Elsevier, Inc. v. Muchnick,* 130 S. Ct. 1237 (2010); and *Union Pac. R.R. v. Bhd. of Locomotive Eng'rs,* 130 S. Ct. 584 (2009). It is a case-processing rule that limits the arguments available to an alien in this court when those arguments have not been raised properly at the agency level. *Korsunskiy v. Gonzales,* 461 F.3d 847, 849-50 (7th Cir. 2006).

Before the IJ and the Board, Issaq stressed his argument that disentitlement to withholding of removal should be conditioned on two findings, not just one: both the commission of a particularly serious crime and a finding that the person was a danger to the community. See § 1231(b)(3)(B)(ii) (no withholding when "the alien, having been convicted by final judgment of a particularly serious crime is a danger to the community of the United States"). In addition, however, he did raise the point about his initial term of imprisonment. We are not inclined to find failure to exhaust, particularly as there is some value in clarifying the scope of the statute.

B

Issaq also argued that he was entitled to relief under the CAT. Once again, the government argues that we have no jurisdiction to consider his argument, this time because Issaq was convicted of a "particularly serious" crime and also because of the Board's finding that his case fails on the facts. In the end, we agree with the government that his case has no merit, but we reach that conclusion by a somewhat different path.

Although petitions for withholding of removal and petitions for relief under the CAT are treated very similarly, the regulations governing the CAT add one additional form of relief for a petitioner:

Protection under the Convention Against Torture will be granted either in the form of withholding of removal or in the form of *deferral of removal*.

8 C.F.R. § 1208.16(c)(4) (emphasis added). Section 1208.17 provides more details about the deferral of removal process:

> An alien who: has been ordered removed; has been found under § 1208.16(c)(3) to be entitled to protection under the Convention Against Torture; and is subject to the provisions for mandatory denial of withholding of removal under § 1208.16(d)(2) or (d)(3) [which include commission of a particularly serious crime], shall be granted deferral of removal to the country where he or she is more likely than not to be tortured.

8 C.F.R. § 1208.17(a). Additional provisions of the regulation make it clear that deferral of removal is at least potentially a more restricted form of relief than withholding. For example, deferral does not confer on the alien any lawful or permanent immigration status; deferral will not necessarily result in the alien being released from the custody if the alien is subject to such custody; and deferral does not protect against removal to a different country from the one in which the alien is likely to be tortured. § 1208.17(b).

This court has struggled with the question whether judicial review of orders denying relief under the CAT based on the commission of an aggravated felony is jurisdictionally barred. Compare *Tunis v. Gonzales,* 447 F.3d 547, 549 (7th Cir. 2006) (stating that an aggravated felony bars review except under the CAT), with *Petrov v. Gonzales,* 464 F.3d 800, 802 (7th Cir. 2006) (holding that even a CAT claim is barred from review if it results

in a final order of removal that rests on a finding that an aggravated felony was committed). In *Petrov,* we pointed out that *Tunis* addressed only the effect of § 1252(a)(2)(B), which prohibits review of decisions committed to the discretion of the Attorney General or the Secretary of Homeland Security, but that it was necessary also to take into account the effect of § 1252(a)(2)(C), which bars review of final orders of removal against certain criminal aliens.

The Supreme Court's decision in *Negusie v. Holder,* 129 S. Ct. 1159 (2009), underscores the need for precision in evaluating the many different kinds of claims that can arise under the immigration laws. There the Court was concerned with the so-called "persecutor bar" that applies to aliens who have persecuted others on a prohibited basis. See 8 U.S.C. § 1101(a)(42). The persecutor bar applies to those seeking asylum or withholding of removal, but "[i]t does not disqualify an alien from receiving a temporary deferral of removal under the Convention Against Torture . . . ." 129 S. Ct. at 1162; see also *id.* at 1178 n.1 (Thomas, J., dissenting) (discussing the remedy of deferral of removal).

This raises the question whether a decision under the CAT to deny even deferral of removal falls within the jurisdiction-stripping provisions of either § 1252(a)(2)(B) or § 1252(a)(2)(C). In our view, the answer is no. Once an alien succeeds in proving the factual prerequisites for relief under the CAT, we understand *Negusie* to hold that some kind of remedy (complete with judicial review) is available, even for persons such as persecutors, whose

claims for asylum or withholding of removal are barred and unreviewable. Consistently with *Tunis,* then, relief under the CAT is not barred by the ban on reviewing discretionary decisions imposed by § 1252(a)(2)(B). No one argued in *Petrov* that the remedy of deferral of removal requires a distinct analysis, and so we cannot take *Petrov* as the last word on that point. And indeed, if an alien is attempting to challenge only a final order of removal, as opposed to a deferral of removal, then there is nothing to criticize in the holding of *Petrov*. If, however, the alien also sought and might have been entitled to the inherently non-final remedy of deferral of removal, then § 1252(a)(2)(C) (which speaks only of a final order) appears to be inapplicable.

This possibility appears to be of little help for Issaq, because nothing in the record suggests that he was seeking a deferral of removal. He relied instead on the argument that his due process rights were violated by the IJ's failure to read and take into account the facts in the International Religious Freedom Report. As we noted earlier, to the extent that the IJ indeed overlooked this evidence, there is a potential problem. But it is not one that allows Issaq to prevail in the end, because he cannot show how he was prejudiced by the IJ's error. Even taking the Report into account, the link to governmental action is too weak, and the evidence showing that Issaq would be tortured or killed is too conclusory.

For these reasons, the petition for review is DENIED.

RIPPLE, *Circuit Judge*, concurring.  I join in the judgment of the court, and its fine opinion with the exception of its jurisdictional discussion pertaining to claims for deferral of removal under the Convention Against Torture. I understand the court to take the view that, in spite of 8 U.S.C. § 1252(a)(2)(C), which bars review of final orders of removal against certain criminal aliens, this court does have jurisdiction to review claims regarding the denial of deferral of removal made by such aliens. Our jurisdiction extends, according to the majority opinion, not only to those petitions raising constitutional claims and questions of law, *see id*. § 1252(a)(2)(D), but also to claims by a covered alien that the Board's determination regarding the likelihood of torture upon repatriation is not supported by substantial evidence, *see* Maj. op. at 14-15.

As the court acknowledges, *id*. at 15, this question is not squarely presented in the case before us and, therefore, need not be decided at this time. Furthermore, I find the court's reliance on *Negusie v. Holder*, 129 S. Ct. 1159 (2009), *Petrov v. Gonzales*, 464 F.3d 800 (7th Cir. 2006), and *Tunis v. Gonzales*, 447 F.3d 547 (7th Cir. 2006), to be a relatively thin reed upon which to base the conclusion regarding our jurisdiction that the court reaches today.

Moreover, although one of our sister circuits has indeed reached the same result on an entirely different basis, *see Lemus-Galvan v. Mukasey*, 518 F.3d 1081, 1083 (9th Cir. 2008), the court neither discusses nor criticizes that approach. Nor does it discuss the opposing view. *See Saintha v. Mukasey*, 516 F.3d 243, 248-49 (4th Cir. 2008)

(dismissing, for lack of jurisdiction, a petition seeking review of a decision denying deferral of removal after concluding that § 1252(a)(2)(C) applied to the deferral claim and that the exception for constitutional claims or questions of law did not apply).

I think the better course is to follow the approach of some of our other sister circuits and reserve judgment until the issue is squarely presented and fully briefed and argued before us. *See De La Rosa v. Holder*, 598 F.3d 103, 107 (2d Cir. 2010) (noting the Ninth Circuit position but expressly declining to decide the issue because the petition only presented a question of law concerning eligibility for deferral); *Cherichel v. Holder*, 591 F.3d 1002, 1009, 1017 (8th Cir. 2010) (noting that the jurisdiction-stripping provision generally applies to CAT claims, but deciding the case under the question of law exception without any discussion of further exemptions to the criminal alien jurisdiction-stripping provision that would preserve review of such aliens' deferral claims).